IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| WILLIAM J. ROBERTS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>                    Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No:  1:08-CV-84 DN<br><br>Magistrate Judge David Nuffer |

Plaintiff William J. Roberts filed suit seeking judicial review of the decision of the

Commissioner denying his applications for disability insurance benefits and supplemental

security income benefits under Titles II and XVI of the Social Security Act.[1]  The case is before

the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).  After a careful review

of the entire record and the parties' submissions, the magistrate judge concludes that the decision

of the Commissioner should be affirmed.[2]

**PROCEDURAL HISTORY**

Roberts applied for benefits on October 23, 2001 (protective filing date) alleging that he

became unable to work on July 7, 2000 due to a back problem.[3]  Roberts' applications were

---

[1]42 U.S.C. §§ 401-433, 1381-1383f.

[2]Roberts has requested oral argument.  However, after examining the briefs and the administrative record, the court has determined that oral argument would not materially assist its determination in this case.

[3]Tr. 70-72, 92.

denied initially,[4] and on reconsideration.[5]  Following a hearing, an Administrative Law Judge

(ALJ) denied Roberts' application in a written decision issued June 26, 2003.[6]  On appeal, the

Appeals Council vacated the ALJ's decision , and remanded the case to the ALJ for further

consideration.[7]  After a second hearing,[8] the ALJ determined that Roberts was not eligible for

benefits because he was capable of performing jobs that exist in significant numbers in the

national economy.[9]  The Appeals Council denied Roberts' request for review, making the ALJ's

decision the final decision of the Commissioner.[10]

## SUMMARY OF EVIDENCE

Roberts was thirty-five years old at the alleged disability onset date.[11]  He had a ninth-

grade education,[12] and had done concrete work and manual labor.[13]

---

[4]Tr. 59-61.

[5]Tr. 55-57.

[6]Tr. 285-92.

[7]Tr. 300-03.

[8]Tr. 560-602.  While the ALJ's first decision was pending before the Appeals Council, Roberts filed a second set of applications.  (Tr. 17, 344-46.)  The ALJ combined the applications for purposes of this case.  (Tr. 17, 563.)

[9]Tr. 35.

[10]Tr. 6-8.

[11]Tr. 70.

[12]Tr. 98.

[13]Tr. 361-64, 368.

## A.  Evidence at the Administrative Hearing

### 1.  Roberts' Testimony

The ALJ questioned Roberts about the time period since the last administrative hearing in 2003.  Roberts testified that his condition had worsened in 2003 in that the pain went about half way down his leg.  At that time, he was taking about two OxyContin a day, but it did not completely relieve the pain.  In 2003, he could sit for fifteen minutes to half an hour, walk for about half an hour, and stand for thirty to forty-five minutes.  He could lift about ten pounds.[14]

In 2004, Roberts' condition remained about the same.[15]  He tried working at Heber Valley Railroad checking spikes and walking the tracks.  Roberts testified it was hard for him, and he probably worked a total of about three weeks.[16]

In 2005, Roberts tried to work at various jobs, but after a couple of days' work, he would miss three or four days because he could not walk.  As a result, he ended up losing each job.  He had one job sanding safes to get them ready to paint.  It was too hard because it involved being on his feet, and bending over a lot.[17]

The ALJ asked Roberts if he could have done a job in 2004-05 where he had the option to sit or stand at will.  Roberts replied that it was possible, except that he had to lie down about six hours a day for an hour at a time.[18]

---

[14]Tr. 564-66.

[15]Tr. 566-67.

[16]Tr. 568.

[17]Tr. Tr. 567-68.

[18]Tr. 568-69.

In 2006, the pain was worse going all the way into his ankle.[19]  Roberts testified that in 2006, he could sit fifteen to thirty minutes, stand fifteen to twenty minutes, and walk only about forty feet which would take him ten minutes.[20]  Roberts could lift a gallon of milk which weighs about eight and a half pounds.  He would lie down six hours a day for an hour at a time.[21]

The ALJ then questioned Roberts about the day before the hearing which Roberts stated was a typical day.  Roberts got up about 10:00.  His wife helped him get into the tub, dress, and tie his shoes.[22]  He then helped his wife around the house for about half an hour, but not all at once.  About noon, he had to lie down because his back and leg were hurting.  His pain was about an eight on a scale of one to ten.  At the time of the hearing, his pain was about a seven-and-a-half.[23]  Roberts remained lying down watching TV the rest of the day.  It took about four hours for the pain to settle down from an eight to a seven.  He did not leave the house at all that day.  He took OxyContin, Lortab, and Ativan with no bad side effects.[24]  In answer to questioning from the ALJ, Roberts testified that he could not have done a job that would have allowed him to move around at will, but which would not have allowed him lie down.[25]

---

[19]Tr. 569.

[20]Tr. 570-71.

[21]Tr. 571.

[22]Tr. 571-72.

[23]Tr. 572.

[24]Tr. 573, 574-75.

[25]Tr. 574.

The ALJ asked Roberts about his recent incarceration in the county jail.  Roberts stated that his neighbor handed him a cigarette which Roberts thought was just a hand-rolled cigarette, but was actually a marijuana cigarette.  About that time, the police arrived, and arrested him.  He spent thirty days in the Juab County Jail.  Roberts stated that his time in jail was "terrible" because he could not get any pain medication and had to spend all of his time lying down.  He also spent thirty days in jail in 2001 for driving on a suspended license.  He stated that marijuana had never been a problem for him.  He admitted that he was addicted to pain medication, but denied any other addictions.[26]

Roberts testified that his physical abilities at the time of the hearing were about the same as in 2006.  That is, he could sit about fifteen to thirty minutes, stand about fifteen to twenty minutes, walk about forty feet taking ten minutes, lift about a gallon of milk, but would have to lie down for about six hours a day.[27]

## 2.  Testimony of the Vocational Expert (VE)

The ALJ asked the VE about a hypothetical individual who was Roberts' age, with his education, and past relevant work with the ability to do a limited range of unskilled, sedentary work.  He could lift no more than eight-and-one-half pounds; stand and walk ten to twenty minutes at a time or about one to two hours in an eight-hour day; sit for fifteen to thirty minutes at a time or six to seven hours in an eight-hour day; would need to move around and change postures frequently, so he would require a sit/stand at will option (at times he could be on his

---

[26]575-77.

[27]Tr. 577.

feet for six to seven hours a day, and other times he would be mostly sitting); no bending

stooping, or squatting of any significance, and in particular no twisting of the torso or low back;

no work on the floor, no kneeling, crawling, or crouching; no significant stair-climbing, but

could go up and down a few steps; no overhead lifting or reaching of any significance; would

need a clean, climate-controlled environment; would require a work area with a restroom near by

for quick access; would require a job of low memory; would be able to understand, remember

and carry out simple instructions utilizing GED levels of math one to two, language one to two,

and reasoning two to three, but must have the option to use memory aids to remember the job

steps and only have minimal changes in work instructions from week to week; would have to be

able to lie down at lunch and on breaks when he was having a bad day; must have a job with a

lower stress level, which means a low production rate type of job, and working only occasionally

with the general public; lower concentration, meaning no mental computations, no sustained,

spontaneous speaking or sustained reading and writing, but still being fairly alert and attentive to

the tasks at hand; and only occasional handling reaching and fingering with the left hand.[28]

     The VE testified that such a person would be able to perform the jobs of dowel inspector

and semiconductor bonder.[29]  There were approximately 20,000 dowel inspector jobs in the

national economy and 40,000 semiconductor bonder jobs.[30]  However, those numbers would be

reduced by 40% to fit all elements of the hypothetical and the need for quick restroom breaks.[31]

---

[28]Tr. 592-93, 595-96.

[29]Tr. 596-97.

[30]Tr. 595.

[31]Tr. 595, 598.

**B.  Medical Evidence**

The medical records in this case are extensive, with the transcript of the administrative proceedings running over 600 pages.  The court has tried to summarize the evidence without going into too much detail.  This has proved to be very difficult, however.  Because the parties and the ALJ addressed the evidence by years, the court will approach it the same way.

**2000**

On June 5, 2000, Roberts went to the emergency room at Central Valley Medical Center in Nephi, Utah, with low back pain after doing some lifting at work.[32]  On July 9, 2000, Roberts returned to the ER complaining of back pain.  He stated that his back pain had gotten better, but he had reinjured it jumping over a fence.  He had no numbness or tingling in the legs, no loss of bowel or bladder control, and no radiation of pain into the legs.  On examination, there was tenderness over the paraspinal muscles bilaterally into the low back, but there was "virtually no spinal tenderness whatsoever."  Range of motion was decreased due to pain.  Straight-leg raising was negative bilaterally.  Reflexes were normal; sensory/motor exam was intact; and no neurological deficits were noted.  The ER physician prescribed Lortab and Soma, and recommended treatment with alternating ice and heat for forty-eight hours, and range-of- motion exercises.[33]

The next day, July 10, 2000, Roberts was seen by medical provider "MB."  He stated that he had gone back to work and his back felt like it was "stiffening up."  Straight-leg raising was

---

[32]Tr. 156.

[33]Tr. 154-55.

painful bilaterally.  He was given Demerol.  The physician also ordered a CT scan and a drug screen.[34]  The drug screen was positive for cocaine.[35]

On July 14, 2000, Roberts again went to the Central Valley ER seeking refills of his medications.  He complained of back pain radiating into his left buttock.  His back was tender to palpation in the lumbar/high sciatical area, with pain and tenderness in the left buttock.  He denied any numbness, loss of sensation, tingling, or weakness in his legs, or difficulty with urination.  He could "forward lean" pretty well, but had trouble straightening up.  He had to "tripod" to get up.  Leaning to the left aggravated his pain.  He could twist left and right without pain, but leaning backwards aggravated the pain.  Straight leg raising on the left caused pain in the back and buttock, but not down the leg.  Straight leg on the right was negative, and deep tendon reflexes were normal.  The ER doctor refilled his prescriptions for Lortab and Soma, and advised him to start physical therapy.[36]

X-rays on August 11, 2000, showed mild degenerative disc disease.  A CT scan the same day showed a disc bulge at L4-5, and possible encroachment on the L5 nerve roots bilaterally.  At L5-S1, there was either a left-sided disc herniation or a conjoined nerve root.[37]

On September 9, 2000, Roberts again went to the Central Valley ER reporting low back pain with no radicular symptoms.  He had good mobility, was able to move around without a limp, and had good flexion/extension of the trunk.  There was no tenderness to palpation.  The

---

[34]Tr. 168-69.

[35]Tr. 167.

[36]Tr. 151-52.

[37]Tr. 150.

ER doctor assessed low back strain, and possible drug-seeking behavior.   Roberts was given an injection of Toradol.[38]  On that same day, Roberts went to a another ER at Mountain View Hospital in Payson, Utah, complaining of back and leg pain without numbness or weakness.  On examination, he had tenderness to palpation, but intact sensory, motor, and deep tendon reflexes. He was given Lortab and Soma and instructed to see Dr. Peterson, his primary care physician, for further medications, rather than getting them from the emergency room.[39]

An MRI of the lumbar spine on September 12, 2000 showed "an extruded free fragment arising from the L5-S1 interspace and lying to the left of midline impinging directly upon the traversing left S1 nerve root."  There was also a concentric disc protrusion at L4-5 contributing to a left-sided neural foraminal stenosis.[40]

On September 14, 2000, Michael Peterson, M.D., completed a completed a Workplace Functional Ability Medical Report Form noting that Roberts might need surgery depending on a neurological consult.[41]

On September 25, 2000, Roberts again went to the Central Valley ER primarily to get his medication refilled.  He complained of low back pain.  He stated that at times his left leg would go numb, but if he changed positions and moved around, it would "wake back up" after about an hour.  He still had pain medication, but wanted his Soma refilled.  The ER doctor explained the risks of addiction in taking Soma with pain medication.  Roberts stated that he understood this,

---

[38]Tr. 149.

[39]Tr. 223-25.

[40]Tr. 147-48, 558-59.

[41]Tr. 261-62.

but had gotten to the point where he could not even straighten up.  He stated he had tried all other muscle relaxers, but Robaxin left a bad taste in his mouth; Skelaxin did not work; and Flexeril caused dry mouth; he specifically wanted Soma.  The ER doctor ended up prescribing 30 Soma with no refills.[42]  Three days later, on September 28, 2000, Roberts saw Dr. Tatton requesting medication for pain.  Dr. Tatton prescribed 50 Percocet and 50 Soma.[43]

On October 3, 2000, Dr. Peterson noted that he had seen Roberts in the past for hepatitis C, abdominal pain, and back pain.  He noted that Roberts had made repeated calls to his home after hours and on weekends even though he had been requested not to do so by Dr. Peterson's wife, his secretary, his nurse, and Dr. Peterson himself.  Because of this, Dr. Peterson had sent him a letter terminating the physician/patient relationship, stating that he would continue to see him for up to thirty days while he chose a new primary care physician.  On October 3, however, Roberts had again called his home, and then the emergency room, asking for Percocet and Soma.  Roberts stated that he had not understood the instructions to get a new primary care physician, and Dr. Peterson agreed to give him Soma and Percocet on a one-time basis.  Since Dr. Peterson's wife had expressed fear at Roberts' repeated calling of her home, Dr. Peterson bluntly told Roberts that if he approached him again, he would call the police.[44]  Within a week, on October 9, 2000, Roberts had obtained additional Percocet from Dr. Tatton.[45]  A few days later, on October 12, 2000, Dr. Tatton noted that Roberts apparently did not tolerate the Percocet and

[42]Tr. 145.

[43]Tr. 254.

[44]Tr. 144.

[45]Tr. 253.

"in a rage threw the entire bottle down the toilet, which was a very interesting response."  He gave Roberts Lortab, but not in the amounts he requested.[46]

On October 21, 2000, Roberts went to the Mountain View ER complaining of pain in his left lower back radiating into his left buttock with numbness.  On examination, straight-leg raising on the left was not possible due to pain.  Straight-leg on the right was negative.  Lumbar range of motion was limited.  Deep tendon reflexes and motor strength were normal.  He was given Demerol and a prescription for Lortab.[47]

On October 26, 2000, Roberts went to the Central Valley ER requesting refills of narcotic pain medication.  He complained of pain in the low back radiating into the left leg.  The ER doctor noted that he had HNP (herniated nucleus pulposus). No formal examination was done.  However, Roberts was ambulatory, and had adequate muscle strength.  The ER doctor noted that Roberts had received a large amount of narcotics over the past four weeks, and that he had to be using more than he indicated to the doctor.  The doctor agreed to provide him with enough Lortab and Soma to last him until his next appointment at  the University of Utah, and required him to sign a narcotics contract.[48]

On November 1, 2000, Joseph Richey, M.D., performed a micro-discectomy for a left-sided herniated nucleus pulposus at L5-S1.[49]  Between November 5 and December 12, Roberts

---

[46]Tr. 252.

[47]Tr. 221-22.

[48]Tr. 142-43.

[49]Tr. 109-13.

requested extra pain medication six times, (twice from Mountain View and four time from Dr. Tatton).[50]

On December 29, 2000, Roberts went to the Central Valley ER requesting refills of his medications.  He stated that his primary care physician, Dr. Tatton, was on vacation.  On examination, Roberts walked with a non-atalgic gait.  Back exam revealed minimal tenderness to palpation over the L5-S1 area.  The surgical incision was well-healed with no signs of infection.  Straight-leg raise on the left produced minimal discomfort.  Straight leg raise on the right was negative.  Sensation and reflexes in the lower extremities were intact.  The ER doctor noted that Roberts had a documented history of drug-seeking and inappropriate behavior.  He  informed Roberts that he was unable and unwilling to refill his narcotic prescriptions in the ER setting.  He suggested that Roberts should call the clinic and request refills before he was completely out of his medications.[51]  Later that same day, Roberts obtained Lortab and soma from the Mountain View ER.[52]

**2001**

In January 2001, Roberts was seen in the Mountain View ER for back pain.  He had intact sensory/motor functioning and deep tendon reflexes.  He was given Lortab and Soma.[53]  Roberts saw Dr. Tatton twice in January.  On one occasion, Roberts told Dr. Tatton that he had

---

[50]Tr. 216-17, 218-20, 248, 249, 250, 251.

[51]Tr. 141.

[52]Tr. 214-15.

[53]Tr. 211-12.

left his medications in his sister's vehicle.[54]  Dr. Tatton noted that Roberts needed a pain clinic, and could not have additional back surgery until he quit smoking.[55]  Dr. Tatton also completed a form for the Department of Workforce Services.  He noted that Roberts had had failed lumbar surgery and was scheduled for repeat surgery in February.  He opined that Roberts "should be able to return to work 6 weeks after surgery,  but it must be work not difficult for his back. Recommend rehabilitation."[56]

On February 17, 2001, Roberts went to the Central Valley ER complaining of "terrible back spasms."  The nurse contacted the pharmacy and found that Roberts had used a significant amount of Lortab over the past month.  On examination, he complained of pain when moving his legs in the supine position.  He did not really have any weakness, although he complained of weakness in the left leg.  He was able to walk, but complained of back pain while walking.  On physical examination, the doctor could find no obvious neurological deficits.  Cranial nerves were intact, and there were no gross focal sensory or motor deficits.  He was prescribed Soma and Vioxx.[57]  On February 27, 2001, Roberts went to the Mountain View ER complaining of back pain.  Straight-leg raising was painful on the left.  Sensory/motor function was intact and deep tendon reflexes were normal.  He was given Lortab and Soma.[58]

---

[54]Tr. 246.

[55]Tr. 247.

[56]Tr. 259-60.

[57]Tr. 140.

[58]Tr. 209-10.

On February 28, 2001, Dr. Richey performed a second low back surgery.[59]  He noted that the surgery went "excellently," and he expected good results.  Roberts was discharged from the hospital on March 3, 2001 with Percocet and Soma.[60]

In March, April, and May, Roberts requested pain medication at least twelve times from several different providers.[61]  On one of those occasions, May 13, 2001, Roberts told a physician at Mountain View ER that he had gone back to work two weeks earlier causing his back pain to flare up.  Roberts did not have any neurological symptoms, bowel or bladder incontinence, or numbness or weakness.  But he stated that "he can lift his left leg some then it just kind of stops on him."  On examination,, sensory and motor functioning were intact, and deep tendon reflexes were symmetric.  The physician noted that when distracted, Roberts he could lift his leg higher than he had shown him.  The physician was unsure why he felt he could only lift it that far.[62]

On June 5, 2001, Roberts saw Dr. Tatton for a lipoma in the right side of his back, and requested pain medication.  Roberts reported that he had tried working in landscaping, but could not do it for more than a couple of days.  He had tried physical therapy, but it hurt him too badly, and a TENS unit was uncomfortable.  Dr. Tatton recommended physical therapy and rehabilitation so that he could train for some kind of work.[63]

---

[59]Tr. 114-22.

[60]Tr. 114-15.

[61]Tr. 133-39, 205-06, 238-44.

[62]Tr. 205-06.

[63]Tr. 236-37.

On June 26, 2001, Roberts saw Dr. Weber in the ER seeking a refill of his Lortab prescription.  Dr. Weber noted several incidents of drug-seeking behavior over the previous few days.  The week before, Roberts had been prescribed OxyContin.  Two days later, on Friday, he demanded Percocet which was denied.  Over the weekend, he called Dr. Tatton and came into the ER demanding Lortab.  He was again requesting Lortab from Dr. Weber.  He claimed that the OxyContin had caused hallucinations through the weekend, so he had flushed them down the toilet.  Dr. Weber did not believe this story, and was convinced that he probably had sold them.  After a lengthy discussion of chronic pain control, Roberts signed a prescription contract agreeing to see only Dr. Tatton or Dr. Weber and to use Nephi Pharmacy for refills.  He was also instructed that "he MUST follow through with physical therapy, since he has had multiple excuses why he cannot not attend."  Dr. Weber also noted that she would set Roberts up with a pain clinic.[64]

During July and August 2001, Roberts received treatment and medications nine times.[65] His physicians commented on his over-use of medication.[66]  On some occasions Roberts had a normal gait, full forward flexion to 45 degrees, intact sensory and motor functioning and reflexes, and moved his extremities without difficulty.[67]  Straight-leg testing appeared to be negative.[68]  During this time, Roberts requested extra medication because he had hurt his back

[64]Tr. 132.

[65]Tr. 130, 197-98, 199-200, 201-02, 203-04, 229, 230, 231, 232-33.

[66]Tr. 203-04, 226, 230, 232-33.

[67]Tr. 198, 199-200, 203-04.

[68]Tr. 130.

changing a tire,[69] and helping a friend roll barbed wire.[70]  Dr. Weber noted that he was engaging in "activities which are inappropriate to his medical condition such as working at the carnival."[71]  On one occasion, July 21, 2001, Roberts was "tearful" and reported that his pain was severe.  The ER doctor noted that evaluation of lower extremity motor strength was very difficult, stating that Roberts had "very poor effort."  Straight-leg tests were not possible due to his discomfort.[72]

Roberts apparently was in jail for several weeks during August and September.  He was seen three times at the Utah County Jail by Don Bowcut, M.D.  Dr. Bowcutt noted that Roberts was healthy-looking and moved remarkably well.  Dr. Bowcut apparently did not prescribe any narcotic pain medication while Roberts was in jail.[73]

On October 6, 2001, Roberts saw Dr. Weber following his release from jail.  Dr. Weber noted that while in jail, he had been "totally weaned off of his Lortab and Soma."  She told him that he would not be going back to taking so much Lortab.  She stated that he needed "to stop being such a drug addict and drug seeking; otherwise, he would not be continued as a clinic patient."  She noted that there was no need for him to take so much Lortab, "especially since he has been able to go for at least his entire jail sentence with no difficulties of any significance."[74]

---

[69]Tr. 201.

[70]Tr. 197.

[71]Tr. 230.

[72]Tr. 202.

[73]Tr. 124-26.

[74]Tr. 228.

On October 25, 2001, Roberts saw Dr. Bingham to get his Soma refilled.  He also wanted an early refill of Lortab, claiming that he had left it his sister's truck and she had driven back to Washington with it.  Dr. Bingham told him that he needed to have his sister mail the Lortab back to him, but Dr. Bingham prescribed a two-week supply.[75]

On November 2, 2001, Roberts saw Dr. Bingham to fill out paperwork for disability.  Dr. Bingham noted that Roberts had mostly no limitations except in the legs and back.  He had an inability to bend or squat due to pain.  He had normal grip and arm strength.  Roberts requested Lortab which was denied because he had received a two-week prescription less than a week earlier.  In an addendum to this note, Dr. Bingham stated that after the visit, he had learned that Roberts had been going to multiple clinics and receiving large quantities of Lortab.  Dr. Weber had called to say that Roberts was being terminated from her clinic because of this.  Dr. Bingham noted that he would be doing the same thing and would send Roberts an official letter.[76]

After Dr. Bingham had refused to provide narcotics, Roberts went to the Mountain View ER later that day complaining of low back pain and stating that he had run out of Lortab.  On examination, Roberts appeared uncomfortable.  There was diffuse tenderness over the paraspinal muscles; lumbar range of motion was limited; deep tendon reflexes were normal; straight-leg raise was negative bilaterally; and motor functioning and sensation were intact.  The ER doctor gave him a prescription for four doses of Lortab and some Robaxin, but refused to prescribe Soma.  He also gave him a shot of Toradol at Roberts' request.  The doctor felt that Roberts was

---

[75]Tr. 128.

[76]Tr. 128-29.

using the ER excessively, and instructed him to get any further medications from Dr. Richey or his primary care physician.[77]

**2002**

On January 14, 2002, Roberts went to the Mountain View ER stating that he twisted his back when his wife fell and he caught her.  He was tender to palpation over the lumbar spine with paraspinal muscle tenderness and midline tenderness.  He had increasing pain to his back with straight-leg raises, but no radicular pain.  Motor and sensory functioning were intact, and deep tendon reflexes were symmetric.  He was given a shot of Demerol.[78]

On January 17, 2002, Roberts returned to the Mountain View ER complaining of left rib pain.  He stated that he was working with a jack and the jack handle came up and hit him in the left rib cage.  On examination of the chest, there was "nothing whatsoever that shows evidence of trauma across that region."  A chest x-ray showed no evidence of fracture or lung disease. The ER doctor noted that Roberts had a long history of abuse of Lortab, and felt that he should not receive narcotics.  He offered Roberts Toradol and/or Ultram.  Roberts refused the Toradol injection, but accepted Ultram.[79]

On January 19, 2002, Roberts returned to the Mountain View ER where he was seen by Ron Barlow, M.D., for followup of the left chest contusion.  Roberts stated that he was feeling much worse and demanded prescriptions for pain medication.  On examination, Dr. Barlow could see no bruising.  Dr. Barlow called the Nephi hospital and was informed that all of the

---

[77]Tr. 195-96.

[78]Tr. 185-86.

[79]Tr. 182-84.

doctors there had told Roberts that they would not give him narcotics under any circumstances. Dr. Barlow noted that this was a case of "doctor and ER shopping." He refused to write a prescription for narcotics, but did refill Roberts' Ultram. Dr. Barlow suspected that Roberts would "jump to another emergency department."[80]

On February 4, 2002, Roberts went to the Mountain View ER complaint of burning pain after bending over to pick up a box of meat while working at a meat-packing plant. He appeared to be in moderate to severe discomfort, and was tender to palpation over the low back. Deep tendon reflexes were normal, and sensation and motor strength were intact. Roberts walked without difficulty. Straight-leg raising caused pain at 30 degrees bilaterally. The ER doctor felt that Roberts was likely seeking narcotics. He discussed with Roberts that he did not think that narcotics should be given in the ER. He gave Roberts a prescription for Soma and referred him to other physicians.[81]

On February 24, 2002, Roberts went to the Central Valley ER complaining of back pain from a motor vehicle accident two days earlier. He did not seek treatment at the time of the accident. He was having increased back pain which was not controlled by his medications and he was out of Lortab. On examination, Roberts was having muscle spasms in the lower back area. He also complained of aching down his legs. The ER physician, Dr. Weber, noted, "These are his normal complaints when he is drug seeking." His reflexes were normal, and he was able

---

[80]Tr. 181.

[81]Tr. 179-80.

to walk without any great difficulty.  Dr. Weber gave him Demerol and Ultram, but denied his request for a Lortab prescription.[82]

On May 4, 2002, Roberts saw Dr. Barlow at the Mountain View ER.  He stated that he had been working with heavy equipment, and had been doubling up on his medication because of worsening back pain.  He reported that he was out of pain medication, and he wanted OxyContin.  Roberts was not neurologically impaired and his reflexes were intact.  Dr. Barlow noted that Roberts had a long history of chronic substance abuse, and refused to prescribe OxyContin.  He gave Roberts ten Soma to get him through the weekend, and instructed him to follow up with Dr. Weber.[83]

On May 14, 2002, Roberts went to the Central Valley ER complaining of back pain and asking for Lortab.  He had some pain to palpation of the paraspinal muscles in the lumber spine. He was given a prescription for Lortab.[84]

On May 26, 2002, Roberts again went to the Central Valley ER, stating that he had run out of pain medication.  He wanted some sample medication to help him make it until Tuesday when he would see his primary care physician, Dr. Weber.  He was given a shot of Toradol, and a six-pack of Lortab to take home.[85]

---

[82]Tr. 431-33.

[83]Tr. 452.

[84]Tr. 427-29.

[85]Tr.424-26.

Roberts went to the Central Valley ER twice in June asking for pain medication.  He was instructed that this was an inappropriate use of the ER.[86]

On July 7, 2002, Roberts again went to the Central Valley ER.  The ER doctor noted that Roberts had been on pain medications for a long period of time.  He noted, however, that Roberts had done quite well without the medications while he spent sixty days in jail.  Roberts had been switched from Lortab to OxyContin to methadone, but the methadone was causing him to be depressed.  He was "very weepy and very depressed-feeling."  On examination, Roberts had some pain to palpation in the paraspinal muscles of the lumbar spine, but no weakness in the lower extremities.  The ER doctor told Roberts that his primary care physician, Dr. Weber, had ordered that he receive no narcotic medication in the emergency department.  Roberts became very distraught and angry.  He was given Celexa for depression.[87]

In a letter to Roberts' attorney, dated July 13, 2002, Dr. Weber noted that she had spoken to Roberts on multiple occasions about getting some training for some other type of work.  She questioned whether retraining was a viable option, however, because of Roberts' limited education and skills.  She recommended that he get a "disability determination."[88]

On August 14, 2002, Roberts returned to the Central Valley Emergency Room "literally writing with pain" after stubbing his toe.  An x-ray was negative.[89]

---

[86]Tr. 422-23.

[87]Tr. 419-21.

[88]Tr. 226.

[89]Tr. 413–18.

On October 29, 2002, Roberts went to the emergency room at Sanpete Valley Hospital in Mt. Pleasant, Utah where he was seen by Gary M. Cole, D.O.  for worsening back pain after doing some lifting.  Roberts reported that he "has had problems with wetting his pants in relationship to his back pain."  On examination, straight-leg raising was possibly positive at 45 degrees.  There was no obvious deformity to the back.  Dr. Cole noted that lumbar spine x-rays showed no significant degenerative disease or fractures.  There was hardware present from previous surgeries.  The assessment was chronic back pain with acute exacerbation.  He was given prescriptions for a short supply of Lortab and Soma.  Dr. Cole learned later that Roberts had "actually become quite violent" with health care providers in Nephi when he did not get narcotics "to the point of apparently even stalking physicians or their spouses."[90]

On November 4, 2002, Roberts saw Dr. Cole at his clinic in Mt. Pleasant for back pain and problems with urinary incontinence.  Roberts reported leg pain, worse on the right than on the left.  On examination, cranial nerves were intact, deep tendon reflexes were normal, upper and lower extremity strength was normal, but sensation was diminished on the right.  Straight-leg raising was equivocal bilaterally.  Heel and toe walking was normal.  Dr. Cole's assessment was chronic back pain with acute exacerbation, and chronic narcotic addiction/drug seeking behavior.  Dr. Cole planned to evaluate the lumbar spine for new disease since Roberts' voiding problem appeared to be new.  Dr. Cole gave Roberts Percocet for pain, referred him to a pain

---

[90]Tr. 480-81.  The radiology report is at Tr. 482.

specialist and order a CAT scan of the lumbar spine.  Dr. Cole noted that he did not anticipate

prescribing any more narcotics, because he thought it would be contributing to his problem.[91]

On November 21, 2002, Roberts went to the Mountain View ER.  He reported that he felt

pain in the left lower back while changing a tire.  On examination, there was diffuse tenderness

to the lumbar spine.  Neurovascular was intact; straight-leg raising was negative.  The diagnosis

was acute low back strain.  He was given Demerol, Perocet, and Soma, and instructed to follow

up with his doctor for further treatment and pain medications.[92]

**2003**

In April 2003, Roberts twice went to the emergency room at Mountain View Hospital in

Payson, Utah.  On the first visit, Roberts stated that he had been lifting boxes and developed pain

in his left gluteal area.  There was no radicular component to the pain, and he denied any

weakness or numbness in the lower extremities.  He complained of leakage after urination.  On

examination, Roberts was alert and walked with a slight limp.  There was tenderness in the lower

lumbar left gluteal area.  Leg-lift was negative.  Roberts could support his weight on his heels

and toes, and could squat 30 percent.  He was given an injection of Stadol.[93]  Roberts returned to

the ER less than a week later requesting more pain medication.  He stated that his urinary

symptoms had resolved.  The ER doctor noted that there were no new neurological deficits or

progression of pain, and he was concerned that Roberts was drug-seeking.  Roberts was given a

---

[91]Tr. 478.

[92]Tr. 450-51.

[93]Tr. 448-49.

prescription for Ultram.  Roberts requested Soma which was denied; he was given Skelaxin instead.[94]

Later in April 2003, Roberts saw Edward Wilson, M.D. for back pain.  He complained of pain shooting down his left leg to his ankle, and difficulty stopping the stream after urination. Dr. Wilson noted that Roberts had not had the CT scan ordered by Dr. Cole, and Roberts said he was not aware of it being scheduled.  Dr. Wilson further noted that Roberts had been "to various emergency rooms over the past few weeks getting pain medicines at each place."  From Roberts' story and his chart, there was a possibility that he was a chronic drug seeker.  But it was also possible that he suffered from chronic pain that was not being dealt with very well.  On examination, Roberts was in no acute distress, but moved very stiffly.  When he sat, he tended to lean back to avoid bending his spine, and appeared to be in moderate pain.  Back range of motion was restricted in side bending, flexion, and extension with pain at the end points.  He had almost normal rotation right and left which was consistent with his lumbar fixation.  Supine straight-leg raise was positive at about 20 degrees.  Dr. Wilson noted that Roberts did not relax enough to have a good straight-leg test.  Sitting straight-leg test was also "somewhat equivocal." Roberts did not complain of pain until it was almost at 180 degrees.  Dr. Wilson stated that Roberts' reaction to motion appeared to be more of spasmic type pain rather than a nerve impingement.  Dr. Wilson's assessment was back pain.  He gave Roberts Percocet, and scheduled an MRI of the lumbar spine to see if there was any neurological impingement which would explain the bladder dysfunction.  Dr. Wilson explained to Roberts that many elements of

_____

[94]Tr. 446-47.

his history suggest drug seeking behavior.  He told Roberts that he would have to follow strict rules if Dr. Wilson was going to do his pain management.  Roberts would have to go only to Dr. Wilson for pain medicine and only to one pharmacy.  Roberts agreed to those terms.[95]

On April 29, 2003, Dr. Wilson noted that Roberts' surgery seemed to have made things worse.  Roberts complained of sharp, grabbing pain in the sacral ileac regions, sometimes with pain shooting down the legs.  He also complained of changes in bladder functioning, essentially dribbling after urination.  On examination, Roberts appeared well.  He was moving fairly easily although he had difficulty bending over.  He was able to get up and down from the examination table unassisted.  Examination of his back showed essentially unchanged restricted range of motion, especially in flexion.  He was tender to palpation over the SI joints, and had some pain with straight-leg raising.  Dr. Wilson gave him Percocet to last until a followup visit in one week when he would have the MRI results.  Dr. Wilson noted that Roberts had been labeled a drug seeker, but that he seemed to have taken his drug contract with Dr. Wilson seriously.[96]

Roberts saw Dr. Wilson several more times in May 2003.  Early in the month, Dr. Wilson noted that Roberts' MRI[97] showed some impingement of the cotta equina area at L4-L5 and some post surgical changes which correlated with where he was having pain including paresthesia into the buttocks bilaterally.  Dr. Wilson noted that although Roberts had a reputation as a drug seeker, Dr. Wilson had checked the narcotics hotline and did not see a pattern of abuse.  On examination, Roberts appeared well, and was moving fairly well.  He had no trouble getting

---

[95]Tr. 476-77.

[96]Tr. 475.

[97]The May 3, 2003 MRI report is at Tr. 468-69.

from the chair to the exam table.  He did have some tenderness to palpation in the low back, SI

area as before.  Percocet seemed to give pretty good pain control.  Dr. Wilson's assessment was

spinal stenosis at L4-L5.  He decided to arrange a neurological consult to help decide whether

there would be any advantage to additional surgery.  Dr. Wilson gave Roberts a choice of a

Duragesic patch or MS Contin.  Roberts chose the MS Contin.  Roberts had brought some

paperwork to fill out for a disability evaluation.  Dr. Wilson noted that he would be restricted

from significant lifting, and would probably need a situation where he could change positions

relatively frequently and perhaps lie down several times a day.  On May 7, 2003, Dr. Wilson

noted that he had completed the work restriction form, limiting lifting to ten pounds, and

restricting work to four hours a day with frequent change of position.[98]

     Later in May 2003, Roberts came in wanting to go back to Percocet for chronic pain.  He

stated that the MS Contin caused too much itching.  He had tried the Duragesic patch, but it kept

falling off.  Dr. Wilson agreed to switch him to Percocet, but first he would have to bring back

the unused MS Contin so that Dr. Wilson could account for and dispose of it.[99]

     Subsequently, Roberts came in wanting Dr. Wilson to change his disability evaluation.

Dr. Wilson had said that Roberts could work four hours which resulted in his losing disability

benefits. Roberts' current status was that he had quite a bit of back pain, moderately well

controlled with MS Contin.  His physical examination was unchanged.  Roberts was due for a

neurological consult with Dr. Tran before a decision was made whether he would need surgery

---

[98]Tr. 474.

[99]Tr. 473.

before going back to work. Dr. Wilson noted that Roberts again wanted to change to Percocet, complaining that MS Contin caused itching. Dr. Wilson explained that both drugs have the same active ingredient. However, Roberts insisted that the MS Contin caused itching and the Percocet did not. Dr. Wilson was not sure Roberts was being honest with him, but gave him a prescription for Percocet. Roberts also asked him to renew Soma as a muscle relaxant. Dr. Wilson told him that he had a policy of not using Soma because he felt that it had a higher abuse potential and was no more effective than other drugs. Dr. Wilson offered to prescribe any other muscle relaxant, but Roberts declined. Regarding disability, Dr. Wilson noted that lifting should be limited to ten pounds occasionally. Dr. Wilson redid Roberts' disability assessment to delay any work placement until after the surgical decision was made in hopes that Roberts would be able to maintain benefits for three more months. Dr. Wilson expected that Roberts would be able to be rehabilitated with a work-hardening program, although he thought there would be a lot of psycho-social barriers.[100]

On May 28, 2003, Dr. Wilson filled out a Workplace Functional Ability Medical Report Form. He noted that it was unknown when Roberts could return to work, and his case should be reviewed in approximately three months.[101]

On May 29, 2003, Roberts saw James T. Tran, M.D., for a neurological consultation. Roberts complained of low back pain radiating into the left buttock and left thigh posteriorly. He had noticed weakness in his left leg for three years. He also complained of numbness in his

---

[100]Tr. 472.

[101]Tr. 435.

left leg and left buttock.  His low back pain was relieved by lying down.  He also reported

urinary incontinence for the past four months with post-void dribbling.  On examination, he was

tender on the left side from L3 to S1.  He was alert and conversant, but in a lot of discomfort.  He

had intact cranial nerves, full 5/5 muscle strength in all extremities except for 4/5 strength in the

left leg, decreased pinprick sensation in the right foot and left ring finger, and discomfort with

heel and toe walking.  Dr. Tran diagnosed lumbar disc herniation at L4-5 causing painful lumbar

radiculopathy, and lumbar facet arthropathy from L3 down to S1 on the left side.  He

recommended facet blocks and physical therapy.[102]

In June, Roberts followed up with Dr. Wilson, and switched from Percocet to

OxyContin.[103]  On June 24, 2003, Roberts went to the Mountain View ER complaining of pain

after tripping over some toys and twisting his back.  He had tenderness along the lumbar spine

with overt spasms.  Straight-leg test was weakly positive on the right and negative on the left.

Deep tendon reflexes were normal and sensation was intact.  He was given Demerol and

prescriptions for Lortab and Robaxin.[104]

On July 1, 2003, Dr. Wilson noted that Roberts was functioning pretty well on

OxyContin, although the pain sometimes woke him up.  He had been taking medication for

anxiety, but reported that he did not need it any more, and was not having any anxiety or

depression.  His affect was bright.  Examination showed mild tenderness to palpation along the

paraspinal lumbar muscles, with near normal range of motion except for flexion which was

---

[102]Tr. 437-38.

[103]Tr. 467.

[104]Tr. 443-44.

limited to 50 degrees with arm support needed and causing significant pain.  Dr. Wilson

discussed Roberts' work abilities with him.  Given his level of functioning, Dr. Wilson believed

there were lots of jobs he could do.  He needed something that did not require heavy lifting like

construction work, and that would "allow him to move around up, down, seated, etc."  Dr.

Wilson suggested that he might be able to do things like small engine "mechanicing" or furniture

face frame construction.  He would be limited to lifting about twenty pounds without a lot of

bending or twisting.[105]

About three weeks later, Dr. Wilson noted that Roberts had not followed up with Dr.

Tran or the University of Utah neurosurgical service as previously instructed.  Dr. Wilson gave

him another copy of Dr. Tran's report as he said he had lost the first one.  Roberts appeared well

and moved freely, and got up and down from the exam table easily.  Dr. Wilson offered him a

steroid injection for his back pain which he refused.  Roberts again asked Dr. Wilson to

cooperate with him on getting disability status.  Dr. Wilson still felt that there were many kinds

of work that Roberts could do.  Dr. Wilson noted that his impression was that Roberts was "more

focused on getting disability than he is on trying to get better."  He wanted Roberts to follow up

with treatment.[106]

On August 2, 2003, Roberts went to the Mountain View ER stating that he had twisted

his back.  He had no new leg pain, just chronic left leg pain that was unchanged.  He had no

extremity numbness or weakness.  There was tenderness to palpation over the low back.  Roberts

---

[105]Tr. 466.

[106]Tr. 465.

was alert and oriented.  Sensory-motor was intact, and reflexes were symmetric.  The ER doctor

diagnosed acute low back strain.  Roberts was given a shot of Demerol and prescribed Percocet

and Soma.[107]

On September 15, 2003, Dr. Wilson removed the lipoma from Roberts' back.  Dr. Wilson

noted that Roberts would have to follow up next month with a new doctor (apparently because

Dr. Wilson was leaving the area).[108]  On September 22, 2003, Roberts reported that he had lost

his pills while camping.  Dr. Wilson replaced them with a lower dose.[109]  Later in the month,

Roberts reported that the lower dose was not controlling his pain and he was waking up at night

crying.  Dr. Wilson gave him an additional prescription for OxyContin.  Dr. Wilson explained

that further episodes of losing pills or taking narcotics in a way that differed from the

prescription would result in his running out of medication.[110]

On October 10, 2003, Roberts saw Dr. Nunn, who denied his request for OxyContin

because she did not feel comfortable with his request given his history.[111]  That same day,

Roberts went to the Mountain View ER stating that his physician had moved out of town and he

had been unable to get his medications refilled.  He had been out of OxyContin for a few days

and felt like he was "going to jump out of his skin."  Roberts reported that tests had shown

evidence of a lipoma in his back pressing on his spinal cord, and there had been attempts to have

---

[107]Tr. 441-42.

[108]Tr. 462-63.

[109]Tr. 462.

[110]Tr. 461.

[111]Tr. 461.

him seen at the University of Utah for possible surgery.  On examination, Roberts was alert, appeared somewhat anxious, and was hesitant to move his back.  There was diffuse, nonspecific tenderness.  Flexion, extension, and straight-leg raising were intact.  The ER doctor concluded that Roberts' "main complaint seems to be withdrawal."  He discussed narcotic dependence and offered detox.  Roberts elected not to do this as he thought that he needed surgery and would need to return to narcotics.  The ER doctor advised him to see a primary care doctor or pain clinic for further pain control.  The doctor gave him the benefit of the doubt and provided Percocet.  Roberts also requested Soma, but the doctor thought this was addiction and prescribed Robaxin instead.[112]

On October 13, 2003, Roberts saw Dr. Cole because Dr. Wilson was leaving the area. Dr. Cole discussed his chronic narcotic use and addiction and agreed to fill his medications on a once-a-week basis until he was comfortable that Roberts was not abusing his medications. Roberts signed a controlled substance management agreement with Dr. Cole.[113]  That same day, Roberts tested positive for marijuana.[114]

**2004**

On January 6, 2004, an agency medical consultant completed a physical residual functional capacity assessment concluding that Roberts was capable of performing light work.[115]

---

[112]Tr. 439-40.

[113]Tr. 457.

[114]Tr. 457, 460.

[115]Tr. 497-503.

On July 11, 2004, Roberts went to the Mountain View emergency room complaining of low back pain as a result of a recent twisting injury.  On examination, Roberts was "unable and unwilling to get up and do flexion extensions."  Deep tendon reflexes were equal bilaterally, cranial nerves and sensory were intact, muscle strength was 5/5 and equal on both sides, and gait was within normal limits.[116]  The ER doctor noted that Roberts had come to the ER with another patient from Nephi.  The ER doctor was informed by Dr. Weber that both Roberts and the other individual had had problems in the Central Valley ER in Nephi.  Roberts had become verbally abusive with nursing staff and had been banned from the Central Valley ER.  When the ER doctor discussed this with Roberts, he became quite angry.  The doctor told Roberts that he was uncomfortable giving him narcotics, and suggested that he try a non-narcotic route.  At that point Roberts became very angry, jumped off the examination table, and began to walk out of the ER with a fairly normal looking gait, despite the fact that he had been unable to move just a few moments earlier when the doctor tried to do the physical examination.[117]

**2005**

Roberts saw Dr. Cole,  or his associate Dr. Day, five times from March 23 to May 9, 2005 for refills of his medications.  Dr. Cole consistently noted that Roberts' pain was controlled with medication.[118]

On May 24, 2005, Dr. Day noted that the clinic had received an anonymous phone call stating that Roberts was selling his OxyContin.  When confronted, Roberts stated that it was

---

[116]Tr. 552-55.

[117]Tr. 555.

[118]Tr. 534-38.

probably a friend to whom he owed money and who was trying to get him in trouble.  He stated that he was taking his OxyContin and desperately needed it for his back in order to work.  His physical examination that day was "within normal limits."  Dr. Day noted that Roberts would receive only two weeks of OxyContin at a time.[119]

In June 2005, Dr. Day noted that Roberts' pain meds were sufficient, and he had no neurological complaints.[120]  In July 2005, Roberts reported he had run out of meds and was starting to go through withdrawal.  He had quit his job at National Vinyl Products because he had to stand a lot without breaks.  Dr. Day noted that he needed to find a job where he did not have to stand so much.[121]

Dr. Day continued to refill Roberts' pain meds in August and September 2005.[122]  On August 3, Roberts was doing well on medication and looking for a new job.[123]  Later in August, Roberts tested positive for marijuana.  He told Dr. Day that his daughter's boyfriend smokes marijuana constantly and that when he goes to visit her, he inhales the air.  Dr. Day told him that he did not believe this story.[124]  On September 28, 2005, Roberts reported that he was going to

---

[119]Tr. 533.

[120]Tr. 531.

[121]Tr. 530.

[122]Tr. 523-29.

[123]Tr. 529.

[124]Tr. 525, 527.

California and would not be back for two weeks, so he would run out of his pain medication.  Dr. Day prescribed an extra two weeks of medication.[125]

On October 14, 2005, Dr. Cole noted that during the month of September, Roberts had somehow received 390 pills when he should have received only 180.  Roberts also reported that he had gone to California and left his medications there, so that he was out and needed more.  Dr. Dr. Cole told him that he would not refill his prescriptions early.  However, he did refill his Lortab and Ativan.[126]  Roberts came in two more times in October seeking refills of his pain medications.  Dr. Cole set up a schedule for his refills.[127]  In November 2005, Dr. Cole noted that Roberts was handling his medications appropriately and his pain was well-controlled.[128]

**2006**

During 2006, Dr. Cole continued to refill Roberts' pain medication prescriptions.  Dr. Cole noted that his pain was reasonably controlled.[129]

Roberts also went to the Mountain View ER several times in 2006.  In January, he came in with a laceration on his left wrist that he had sustained at work.[130]  On March 23, 2006, he complained of muscle spasms in his back radiating down his left leg and around through his abdomen.  Roberts said this started when a dog pushed him against a wall.  He wanted muscle

---

[125]Tr. 523.

[126]Tr. 522.

[127]Tr. 520-21.

[128]Tr. 519.

[129]Tr. 506–17.

[130]Tr. 550-51.

relaxers until he could see his doctor in a week to ten days.  He stated that Soma had worked

well in the past.  His back was diffusely, mildly tender.  Deep tendon reflexes were normal,

sensory/motor was intact.  He was able to heel walk, toe walk, and squat without difficulty.  He

sat up straight forward slowly, and moved slowly, but walked without difficulty.  The ER doctor

was uncomfortable  prescribing additional addicting medications, but nevertheless gave him a

prescription for three Soma pills.[131]

Roberts returned the next day complaining of back pain and spasms in his left leg.

Straight-leg raising was negative, and sensation was intact.  The ER doctor noted that he would

give Roberts the benefit of the doubt and prescribed Soma and Percocet, eight each, to get him

through the weekend.[132]

On July 23, 2006, Roberts went to the Mountain View ER stating that he had run out of

his pain meds and needed them refilled.  The ER doctor diagnosed narcotic withdrawal

syndrome.  He gave Roberts the benefit of the doubt and prescribed ten Percocet and three

Ativan.[133]

Roberts was incarcerated during November and December 2006 for possession of

narcotics.[134]

## DISCUSSION

## A.  Legal Standard

--------

[131]Tr. 546-48.

[132]Tr. 544-45.

[133]Tr. 541-42.

[134]Tr. 329.

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[135]  The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[136]

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[137]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[138]

The Commissioner's decision must be supported by substantial evidence.[139]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

---

[135]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[136]42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[137]*Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[138]*Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

[139]*Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997).

support a conclusion."[140]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[141]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[142]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[143]  However, the court should carefully examine the record and review it in its entirety.[144]  Failure of the Commissioner to apply the correct legal standard is grounds for reversal.[145]

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)     A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)     A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled.  20 C.F.R. § 416.920(c).

(3)     A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is conclusively presumed to be disabled.  20 C.F.R. § 416.920(d).

---

[140]*Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[141]*Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[142]42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390.

[143]*Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996).

[144]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[145]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

(4)     A person who is able to perform work he has done in the past is
        not disabled.  20 C.F.R. § 416.920(e).

(5)     A person whose impairment precludes performance of past work is
        disabled unless the Secretary demonstrates that the person can
        perform other work available in the national economy.  Factors to
        be considered are age, education, past work experience, and
        residual functional capacity.  20 C.F.R. § 416.920(f).[146]

**B.  The ALJ's Decision**

The ALJ performed the sequential analysis, finding as follows:  (1) Roberts has not

engaged in substantial gainful activity since July 7, 2000, the alleged onset date of disability;[147]

(2) he has severe impairments including "degenerative disc disease, status post discectomy and

fusion,"[148] (3) he does not have an impairment or combination of impairments that meets or

equals the listings;[149] (4) he is unable to perform his past relevant work;[150] but (5) he is capable of

performing jobs that exist in significant numbers in the national economy.[151]  Examples of jobs

that the ALJ found Roberts could perform include dowel inspector and semi-conductor bonder.[152]

Based on these findings, the ALJ concluded that Roberts was not disabled as defined by the

Social Security Act.[153]

---

[146]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[147]Tr. 20.

[148]Tr. 20.

[149]Tr. 20.

[150]Tr. 32.

[151]Tr. 33.

[152]Tr. 34.

[153]Tr. 35.

Roberts contends that the ALJ's decision should be reversed  because (1) the ALJ failed to properly evaluate his impairments under Listing 1.04; (2) the ALJ failed to give proper weight to the opinions of his treating physicians; (3) the ALJ erred in finding Roberts not credible; (4) the ALJ erred in assessing Roberts' Residual Function Capacity; (5) the ALJ erred in finding Roberts is able to perform the jobs identified by the VE; and (6) the ALJ erred in finding that there are a significant number of  jobs that Roberts can perform.

## C.  Step-Three Determination

At step three of the analysis, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."[154] Thus, an individual who has an impairment that matches or equals a listed impairment is determined to be disabled and entitled to benefits without further inquiry.[155]  In order to match a listed impairment, all of the criteria of the listing must be met.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[156]

"Because the listings could not possibly include every physical impairment severe enough to prevent the claimant from 'any gainful activity,' the Secretary also established regulations for assessing unlisted impairments or combinations of impairments."[157]  An

---

[154]*Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).

[155]*Id.*

[156]*Id.* at 530.

[157]*Puckett v. Chater*, 100 F.3d 730, 733 (10th Cir. 1996)(quoting *Davidson v. Secretary of HHS*, 912 F.2d 1246, 1251-52 (10th Cir. 1990).

impairment that is "medically equivalent" to a listed impairment will suffice.[158]  In order to

establish medical equivalence, a claimant must present medical findings at least equal in severity

to all of the criteria of the one listed impairment most similar to the claimant's impairment.[159]

The determination of medical equivalence must be based on medical evidence alone.[160]  Thus, a

claimant cannot qualify under the "equivalence" test by showing that the "overall functional

impact" of his impairment is as severe as that of a listed impairment.[161]

     Roberts contends that the ALJ should have found that he met or equaled Listing 1.04.

Listing 1.04 provides as follows:

> 1.04  *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise of a nerve root (including
> the cauda equina) or the spinal cord.
> With:
>
>     A.  Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine);
>
> or
>
>     B.  Spinal arachnoiditis, confirmed by an operative note or pathology
> report of tissue biopsy, or by appropriate medically acceptable imaging,
> manifested by severe burning or painful dysesthesia, resulting in the need for
> changes in position or posture more than once ever 2 hours;

---

[158]*Puckett,* 100 F.3d at 733.

[159]*Zebley*, 493 U.S. at 531; *Puckett,* 100 F.3d at 733.

[160]*Puckett,* 100 F.3d at 733; *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

[161]*Zebley*, 493 U.S. at 531.

or

      C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[162]

Roberts contends that the ALJ committed reversible error by failing to provide adequate analysis at step three.  The ALJ's entire step-three determination consists of the following statement:

> Although neither the claimant nor his representative alleged a meeting or equaling of any listing, special review has been given to Listing 1.04 (Disorders of the Spine) . . . . Specifically, the medical evidence set forth in detail below fails to document that the claimant has exhibited the signs or findings to meet this Listing.  While the claimant's impairment is severe, it is not severe enough to medically meet or equal this Listing.  Therefore, the claim cannot be resolved at this step of the sequential evaluation process.[163]

Citing *Clifton v. Chater*,[164] Roberts states that under Tenth Circuit caselaw, the ALJ is required to "identify the listing or listings relevant to the claimant's impairments, discuss the evidence regarding those listings, and give reasons for the conclusion that the claimant's condition does not meet or equal those listings."[165]  Roberts contends that the ALJ did not properly evaluate his impairment under the listing because he "did not include any actual analysis comparing the requirements of Listing 1.04 to the objective medical evidence."[166]

---

[162]20 C.F.R. Pt. 404, Subpt. P., App. 1 (pt. A) § 1.04 (2008).

[163]Tr. 20.

[164]79 F.3d 1007, 1009 (10th Cir. 1996).

[165]Roberts' Opening Brief (Opening Brief) at 26, docket no. 15, filed January 12, 2009.

[166]*Id.* at 25-26.

At the outset, the court notes that this case differs from *Clifton* in that the ALJ in *Clifton* failed to even identify which listings he considered.[167]  In this case, the ALJ identified the appropriate listing, and stated that he had given it "special review."  He concluded, however, that the required findings were not documented in the medical record.  Although the court agrees with Roberts that it would have been preferable for the ALJ to have compared the listing requirements with the evidence of record, the court concludes that any error in the ALJ's analysis was harmless.[168]

Roberts contends that his impairments meet the requirements of subsection A of Listing 1.04, or in the alternative, that they equal subsection B.  Roberts states that regarding the main requirements of Listing 1.04, there is no question that he suffers from "Disorders of the Spine." He notes that he has a herniated disc at L4-5 verified by neurologist Dr. Tran.  Further, the ALJ himself found that Roberts has degenerative disc disease, and an MRI shows that there is facet arthritis, as also confirmed by Dr. Tran.[169]  With respect to the requirements of 1.04A, Roberts states that there is evidence of nerve root compression, again as confirmed by Dr. Tran and the 2003 lumbar MRI.[170]  He further asserts that he continued to have a neuro-anatomic distribution

---

[167] *Clifton*, 79 F.3d at 1009.

[168]  In fairness to the ALJ, apparently neither Roberts nor his counsel indicated to him that they believed Roberts's impairment satisfied the Listing.  Had they done so, the ALJ would have been on notice that he needed to provide a more in-depth discussion at step three.  In *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009), the Tenth Circuit observed that the ALJ's failure to discuss a particular listing was unsurprising when the claimant did not allege that she suffered from that impairment at the administrative hearing.  The court further stated that "an ALJ is generally entitled to 'rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.'" *Id.*

[169] Opening Brief at 27 (citing Tr. 438).

[170] Opening Brief at 27 (citing Tr. 438.

of pain, even after his surgeries, as evidenced by his complaints of pain radiating into his left buttock and leg.[171]  He states that he also exhibited limited range of motion in his spine,[172] and that there is evidence of motor loss (weakness) in his legs,[173] and sensory loss by proof of numbness or loss of sensation.[174]  Finally, he had positive straight-leg raising tests.[175]

In response, the Commissioner argues that there is no evidence that Roberts' impairment met all of the requirements of Listing 1.04A.  The Commissioner further argues that even giving Roberts the benefit of the doubt, there is no evidence that the listing was satisfied for twelve consecutive months.  The Commissioner acknowledges that "there appeared to be evidence of nerve root impingement and a neuroanatomic distribution of pain with some limitation of motion as required under subsection A."[176]  However, Roberts' "range of motion was sometimes noted to be 'good' or near normal."[177]  Similarly, there was no consistent evidence of motor loss accompanied by sensory or reflex loss as required by the listing.  Instead, Roberts' physical examinations repeatedly showed that he had intact motor functioning, sensation, and reflexes.[178]

---

[171]Opening Brief at 27 (citing Tr. 437, 476, 547).

[172]Opening Brief at 27 (citing Tr. 195, 243, 466, 476).

[173]Opening Brief at 27 (citing Tr. 437, 448).

[174]Opening Brief at 27 (citing Tr. 437, 438, 478, 590).

[175]Opening Brief at 27 (citing Tr. 180, 444, 476, 478, 480).

[176]Defendant's Answer Brief (Commissioner's Brief) at 19, docket no. 16, filed February 12, 2009.

[177]Id. (citing Tr. 149, 198, 204).

[178]Commissioner's Brief at 19 (citing Tr. 140, 141, 151-52, 154-55, 195-96, 198, 199-200, 203-04, 205-08, 210, 211-12, 223-25, 443-44, 446-47, 448-49, 547-48, 553-56).  See also Tr. 209, 441-42.

Likewise the Listing's requirement of positive straight-leg raising tests was not satisfied for a period of twelve consecutive months.[179]  As the Commissioner explains, the straight leg raising test is used to determine whether nerve root involvement is contributing to the claimant's pain.  It is primarily a subjective test in that it is considered positive if the claimant tells the examiner that raising his leg causes pain.[180]

On July 9, 2000, around the time of Roberts' initial injury, straight-leg raising was negative bilaterally.[181]  However, the next day, July 10, straight-leg raising was painful bilaterally.[182]  In an undated note which from the context probably was August or September 2000, straight-leg raising was positive on the left and "normal" on the right.[183]  On December 29, 2000, about two months after Roberts' first back surgery, straight-leg raising produced "minimal discomfort" on the left, and was negative on the right.[184]  On May 13, 2001, Roberts stated that he could only lift his leg so far and then it would stop.  But the ER doctor noted that Roberts could actually lift his leg higher when distracted.[185]  The Commissioner asserts that this suggests

---

[179]Commissioner's Brief at 19-20.

[180]Commissioner's Brief at 19-20.  As the Commissioner notes, the Listing requires a positive straight leg test in both the seated and supine position.  Roberts' medical records generally do not specify whether the test was performed in a seated or supine position.

[181]Tr. 154-55.

[182]Tr. 168-71.

[183]Tr. 255.

[184]Tr. 141.

[185]Tr. 205-08.

that Roberts might have been manipulating the test.[186]  Straight-leg tests were negative in July

and November 2001.[187]  Tests in October and November 2002 were "possibly positive" and

"equivocal."[188]  Later in November 2002, straight-leg testing was negative.[189]  In April 2003, the

test was again negative,[190] but was positive later in the month and in June 2003.[191]  However, two

months later in August 2003, Roberts had no symptoms of nerve root involvement.[192]  Straight

leg-test continued to be negative in October 2003 and March 2006.[193]

The claimant has the burden at step three to present evidence establishing that his

impairment meets are equals the listings.[194]  Further, the claimant must show that the criteria

were met for a continuous period of at least twelve months (duration requirement).[195]  As the

Commissioner argues, Roberts failed to carry his burden to show that his impairment met all of

the requirements of Listing 1.04A for a continuous twelve-month period.  Thus, there is

substantial evidence in the record to support the ALJ's finding that Roberts' impairment did not

satisfy the requirements of Listing 1.04A.

---

[186]Commissioner's Brief at 20.

[187]Tr. 130, 195, 544.

[188]Tr. 478, 480.

[189]Tr. 450-51.

[190]Tr. 448.

[191]Tr. 475-76, 443-44.

[192]Tr. 441-42.

[193]Tr. 440, 544.

[194]*Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).

[195]20 C.F.R. §§ 404.1509, 416.909.

In his reply brief, Roberts argues that the Commissioner's step-three argument constitutes a post-hoc attempt to justify the ALJ's reasoning.[196]  While Roberts is correct that post hoc rationale is generally improper,[197] an ALJ's error does not require reversal where his findings elsewhere in the decision "coupled with indisputable aspects of the medical record, conclusively preclude Claimant's qualification under the listings at step three."[198]  In this case, it is clear from the medical records alone that Roberts could not satisfy Listing 1.04A.

Roberts also argues that his impairment equals Listing 1.04B pertaining to spinal arachnoiditis.  In support of this argument Roberts states:

> With respect to Listing 1.04B and medical equivalence for this particular Listing, there is evidence of compression of the thecal sac (a membrane that surrounds the spinal cord, as compared to the "arachnoid" referred to in Listing 1.04B, which is the second-layer membrane sheathing the spinal cord), evidence by MRI imaging of a "broad-based posterior disc bulge that flattened the anterior aspect of the thecal sac and moderately narrowed the left L4 neural foramina and at least slightly impinging the left L4 nerve root (Tr. 468), compression of the posterior aspect of the thecal sac at that same region (Id.), a lipoma measuring 8 mm x 2.5 cm x 8mm centered posterior to the L4-5 disc space within the spinal canal (Id.), and ligamentum flavum hypertrophy at the L4-5 level.  (Id.)  As Dr. Jones noted, "These combined findings, however, result in <u>moderate to marked compression of the thecal sac at this region</u>."  (Id.)[199]

Roberts asserts that this "moderate to marked compression of the thecal sac, which is a structure similar to and adjacent to or nearly adjacent to the arachnoid, is medically equivalent to the

---

[196]Reply Brief (Reply) at 3-4, 8, docket no. 17, filed February 25, 2009.

[197]*Carpenter v. Astrue*, 537 F. 3d 1264, 1267 (10th Cir. 2008).

[198]*Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005).

[199]Opening Brief at 28.

requirements of Listing 1.04B."[200]  With respect to the requirement of "severe burning or painful

dysesthesia," Roberts states that he experiences "burning pain."[201]  Finally, Roberts states that

there is no question that he meets the final requirement that he must change positions frequently

as found in the ALJ's RFC assessment.[202]  The Commissioner failed to address Roberts' medical

equivalence argument except to state in passing that Roberts cannot satisfy subsection B of the

listing because there is no evidence of spinal arachnoiditis.[203]  After careful consideration,

however, the court concludes that Roberts cannot prevail on his medical equivalence argument.

    The determination whether a claimant meets or equals a listed impairment must be based

on medical evidence alone.[204]  First, as the Commissioner observed, there is no evidence of spinal

arachnoiditis confirmed by findings as specified in Listing 1.04B.  Further, the court is not

convinced that compression of the thecal sac would be the equivalent of arachnoiditis.  Even

assuming, however,  that compression of the thecal sac could be the equivalent of arachnoiditis,

the medical evidence does not support the requirement that the impairment be manifested by

severe burning or painful dysesthesia.  Although Roberts did testify at the hearing that he

sometimes experiences a burning pain,[205] his testimony is insufficient to satisfy the listing which

requires medical evidence.  The only medical evidence cited by Roberts to support this

---

[200]*Id.*

[201]*Id.* (citing Tr. 179, 590).

[202]Opening Brief at 28 (citing Tr. 20).

[203]Commissioner's Brief at 18.

[204]*Puckett*, 100 F.3 at 733; *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

[205]Tr. 590.

requirement is an ER report dated February 4, 2002.  The ER physician noted that Roberts stated that "he was working at a meat packing plant, bent over to pick up a box of meat, and had some burning in his back."  Roberts also stated that he could not bend over and complained of severe pain.  He denied any bowel or bladder incontinence; numbness, weakness, or tingling in his legs; or leg pain.  Roberts appeared to be in moderate to severe discomfort and was tender to palpation over the low back. With the exception of a positive straight-leg test bilaterally, however, the rest of his examination was normal including deep tendon reflexes, sensation, and motor strength. Roberts could walk without difficulty.  The ER physician concluded that Roberts was "likely seeking narcotics."[206]  Although not specifically cited by Roberts, the medical records contain only one other reference to burning pain which occurred on July 21, 2001 after Roberts hurt his back changing a tire.  Thus, on both occasions, the pain appeared to be the result of exacerbation of Roberts' back injury, rather than an ongoing type of pain.  Other than these two occasions, Roberts' medical records do not refer to "severe burning or painful dysesthesia."  Moreover, the records reflect that Roberts' pain was fairly well controlled with medication.

In conclusion, the court is confident that no reasonable factfinder could have found Roberts presumptively disabled under Listing 1.04.[207]  The medical records alone preclude such a finding.  Further, the ALJ's RFC findings that Roberts retained the primary postural capacities, i.e., sitting, standing, walking with a sit/stand option, for sedentary work demonstrate that even absent the alleged error, there was no possibility that the ALJ could have found Roberts

---

[206]Tr. 179-80.

[207]*See Fischer-Ross*, 431 F.3d at 735.

presumptively disabled under Listing 1.04.[208]  Thus, a remand would be purely formalistic,

unjustifiably prolonging the administrative proceedings.[209]  Accordingly, "any deficiency in the

ALJ's articulation of his reasoning to support his step three determination is harmless."[210]

## D.  Analysis of Medical Opinions

Next, Roberts argues that the ALJ failed to give proper weight to the opinions of his

treating physicians, Dr. Weber and Dr. Cole; specifically, Dr. Weber's opinion that Roberts

could only work part time, and the opinion of Dr. Cole that he would need to lie down for six

hours a day.

"The ALJ is required to give controlling weight to the opinion of a treating physician as

long as the opinion is supported by medically acceptable clinical and laboratory diagnostic

techniques, and is not inconsistent with other substantial evidence in the record."[211]  "An ALJ

may disregard a treating physician's opinion, however, if it is not so supported."[212]  In all cases,

the regulations require that the ALJ "give good reasons" in his decision for the weight that he

gave to the treating physician's opinion.[213]

---

[208]Tr. 20-21.  *See Fischer-Ross*, 431 F.3d at 735 (stating that the ALJ's RFC findings "conclusively negate the possibility of any finding that Claimant is presumptively disabled under [Listing 1.04]."

[209]*See Fischer-Ross*, 431 F.3d at 733.

[210]*Id.* at 735.

[211]*Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).

[212]*Doyal*, 331 F.3d at 762 *(citing Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994)).

[213]*Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

If a treating source opinion is not entitled to controlling weight, it is still entitled to

deference,[214] and must be weighed using the following factors:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.[215]

**1. Dr. Weber's Opinion**

On May 14, 2002, Dr. Weber wrote a letter to the Division of Disability Determination

Services (DDS) stating as follows:

> The patient is a 37-year-old male who has had two previous back surgeries for
> severe disk degeneration and deterioration.  Both surgeries have been a failure.
> The patient has worked in the past with cement, both bricking and pouring
> cement, and has had major back injuries in the past.  He is at this time fairly
> incapacitated due to pain.  He requires daily pain medications to function on a
> minimal level.  He does want to work and earn money, but all of his training has
> been with cement work and this is physically impossible for him to do at this
> time.  I have recommended that in the future if he is able to be trained for a
> position that would provide him with sit/stand option this may be a possibility for
> part-time work, but I certainly do not feel that he would ever be able to hold down
> any full time employment with the back problems that he currently has.[216]

In his decision, the ALJ rejected the opinion of Dr. Weber that Roberts could only work

part time, stating that "it is not supported by the record as a whole or her own clinical notes."[217]

---

[214]*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *Robinson v. Barnhart*, 366 F.3d 1078, 1082
(10th Cir. 2004).

[215]*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)(quoting *Goatcher v. United States Dep't of
HHS*, 52 F.3d 288, 290 (10th Cir. 1995)); *accord Robinson*, 366 F.3d at 1082.

[216]Tr. 227.

[217]Tr. 31.

The ALJ noted that except for an emergency room visit on February 24, 2002,[218] Dr. Weber had

last seen Roberts on October 6, 2001.[219]  And on November 2, 2001, Dr. Weber notified Dr.

Bingham that she had discontinued treatment due to Roberts' drug-seeking behavior.[220]  The ALJ

further stated that "Dr. Weber's treatment notes do not contain any clinical or laboratory findings

to support her conclusion.  Her progress notes consist mainly of discussions with the claimant

regarding his drug seeking behavior and noncompliance with pain contracts."[221]

Roberts argues that contrary to the ALJ's statement, Dr. Weber's treatment notes *do*

support her opinion.  In support of this argument, he points to exam notes from March 28, 2001,

in which Dr. Weber noted that Roberts had limited flexion and extension, and almost no side

bending.[222]  As a second example, Roberts notes that on February 24, 2002, Dr. Weber treated

Roberts in the ER following a motor vehicle accident and noted that he was having back spasms

in his lower back and gave him Demerol, Phenergan, and a prescription for Ultram.[223]  Roberts

argues that these "are findings based on objective medical evidence that serve to support Dr.

Weber's opinion that Mr. Roberts is unable to engage in more than part-time work, and the

--------

[218]Tr. 31, 431.

[219]Tr. 31, 228.

[220]Tr. 31, 128-29.

[221]Tr. 31.

[222]Opening Brief at 29 (citing Tr. 243).

[223]Opening Brief at 29 (citing Tr. 431).

ALJ's finding that there are 'no' clinical findings to support Dr. Weber's opinions is not supported by the substantial evidence."[224]

While Dr. Weber's treatment notes cited by Roberts demonstrate that he had the symptoms mentioned on the dates of the examinations, those notes do not indicate that she believed Roberts could only work part-time or provide any reasons to support her May 14, 2002 letter. Rather, as the ALJ observed, most of her treatment notes consist of discussion regarding Roberts' drug-seeking behavior. Accordingly, the court concludes that the ALJ gave sufficient reasons for rejecting Dr. Weber's opinion that Roberts could only work part time.

### 2. Dr. Cole's Opinion

Dr. Cole completed a Physician's Assessment of Physical Capacities indicating that Roberts can sit fifteen minutes at a time, stand thirty to forty-five minutes, walk for an hour, but must lie down six hours out of an eight-hour workday.[225] The ALJ stated that he had carefully considered Dr. Cole's opinion and Roberts' testimony that he must lie down six hours in an eight-hour day. First, the ALJ noted that Dr. Cole did not say why Roberts would need to lie down for eight hours. Further, there were "no reports in the clinical records of this degree of recumbency, or any suggestion that he lie down for this long for therapeutic reasons."[226] In addition, Dr. Cole's examinations of Roberts were all "well within normal limits with no

---

[224]Opening Brief at 29.

[225]Tr. 539. This form is undated, but counsel states that it must have been completed around May 2, 2006 based on Dr. Cole's references in his treatment notes to completing the disability paperwork. (Opening Brief at 18, footnote 25 (citing Tr. 509).)

[226]Tr. 31.

evidence of any neurological deficits."[227]   The ALJ emphasized that "Dr. Cole's treatment

records make no mention that the claimant has to be recumbent 6 out of 8 hours each day nor do

his treatment records place any restrictions on the claimant."[228]   The ALJ noted that Dr. Cole had

mainly seen Roberts for prescription refills and apparently had relied quite heavily on Roberts'

subjective reports of "disabling pain."   The ALJ observed that, as explained elsewhere in his

opinion, there were good reasons for questioning the reliability of Roberts' subjective

complaints.[229]   The ALJ noted that no other treating physician had placed any limits on Roberts

except that he was precluded from strenuous work, could not stand for prolonged periods, and

needed to change postures frequently, all of which the ALJ included in his RFC.[230]

     Roberts takes issue with ALJ's statement that Dr. Cole's examinations were "well within

normal limits with no evidence of any neurological deficits."   He contends that this statement is

not true pointing to an examination on October 29, 2002, in which Dr. Cole noted that Roberts

had problems with wetting his pants in relation to his back pain and had a "possibly positive"

straight-leg raising test.[231]   As another example, a few days later on November 4, 2002, Roberts

stated that he had trouble controlling urinary voiding.   On examination, sensation was

---

[227]Tr. 31.

[228]Tr. 31.

[229]Tr. 31-32.   See *Oldham* v. *Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007)(holding that ALJ properly refused to credit opinions of medical providers that relied upon the claimant's veracity where there was evidence of the claimant's propensity to exaggerate symptoms and manipulate test results.).

[230]Tr. 32.

[231]Opening Brief at 30 (citing Tr. 480).

diminished on the right, and straight-leg raising was "equivocal bilaterally."[232]  Further, Roberts

argues that the Dr. Cole's opinion is not inconsistent with the medical records, noting that the

"ALJ does not refer to any specific medical evidence directly contradicting Dr. Cole's opinion"

regarding his need to lie down.  Roberts further contends that the opinions of Drs. Weber and

Cole are not contradicted by other substantial medical evidence.[233]

      Although there may be no evidence that directly contradicts the opinions of Drs. Cole

and Weber, there is conflicting evidence in the record that the ALJ discussed in other sections of

his opinion.  In particular, there are several opinions that Roberts could perform work.  For

example, Dr. Tatton opined that Roberts should be able to return to work six weeks after his

February 28, 2001 surgery and recommended rehabilitation.[234]  On July 1, 2003, Dr. Wilson

discussed Roberts' work abilities with him.  Dr. Wilson believed that given Roberts' level of

functioning there were a lot of jobs that he could do.  He just needed to find something that did

not require continuous heavy lifting like construction work, and that would allow him to move

around, "up, down, seated, etc."  Dr. Wilson suggested small engine mechanics, or furniture face

frame construction.  He limited lifting to twenty pounds without a lot of bending or twisting.[235]

On July 25, 2003, Dr. Wilson stated, "I still feel that there's many kinds of work that he can do."

He noted that Roberts seemed to be more focused on getting disability than on trying to get

---

[232]Opening Brief at 30 (citing Tr. 478).

[233]Opening Brief at 30.

[234]Tr. 21, 259-60.

[235]Tr. 25,466.

better.[236]  On July 5, 2005, Roberts told Dr. Day that he had quit his job at National Vinyl

Products because he had to stand a lot and they were not giving him morning, afternoon, or lunch

breaks.  Dr. Day signed a note stating that Roberts had difficulty standing for long periods.  Dr.

Day noted that Roberts needed to find a job that did not require so much standing.[237]

In his reply brief, Roberts asserts that the ALJ committed reversible error by failing to

consider the specific factors outlined above to be used in determining what weight to give

medical opinions.[238]  However, the ALJ need not discuss every factor in evaluating a medical

opinion.[239]  This is so because "[n]ot every factor for weighing opinion evidence will apply in

every case."[240]  An ALJ's opinion is sufficient if it makes clear the weight he gave the treating

source's opinion and the reasons for that weight.[241]

In this case, the ALJ adequately considered the relevant factors including that

(1) Drs. Weber and Cole were treating physicians; (2) the length and nature of the relationship,

noting that Dr. Weber had terminated her treatment of Roberts and her notes consisted mainly of

discussions of Roberts' drug-seeking behavior, and that Dr. Cole's treatment consisted mainly of

filling prescriptions; and (3) that their opinions were not supported by the record as a whole.

---

[236]Tr. 25, 465.

[237]Tr. 27, 530.

[238]Reply at 10.

[239]*Oldham*, 509 F.3d at 1258.

[240]*Id.* (quoting SSR 06-3p), 2006 WL 2329939, at *5 (SSA Aug. 9, 2006)).

[241]*Oldham*, 509 F.3d at 1258.

Roberts also asserts that the ALJ was guilty of "picking and choosing" the evidence to support his opinion.[242]  Although the ALJ is required to discuss the evidence he chooses to rely on as well as the significantly probative evidence he rejects, he is not required to discuss every piece of evidence.[243]  In this case, the record reflects that the ALJ carefully reviewed and discussed the evidence, and gave "good reasons" in his decision for the weight that he gave the opinions of Drs. Weber and Cole.[244]  This court may not reweigh the evidence or substitute its judgment for that of the ALJ.[245]

**E.  Credibility Determination**

Roberts argues that the ALJ did not properly evaluate his chronic pain and its impact on his RFC based upon the record as a whole.  Rather, he contends that the ALJ essentially gave his descriptions of his pain and functional limitations no weight at all.[246]

Roberts notes that a claimant's pain should be evaluated under the factors set forth in *Luna v. Bowen.*[247]  In *Luna*, the Tenth Circuit set forth a framework for evaluating subjective allegations of pain.  Under this analysis, the ALJ must determine (1) whether the claimant has established by objective medical evidence that he has a pain-producing impairment; (2) whether there is a "loose nexus" between the impairment and the claimant's subjective allegations of

---

[242]Reply at 11.

[243]*Clifton*, 79 F.3d 1007 at 1009-10; *Wall*, 561 F.3d at 1067.

[244]See *Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

[245]*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007); *Wall*, 561 F.3d at 1069.

[246]Opening Brief at 31.

[247]834 F.2d 161 (10th Cir. 1987).

pain; and (3) if so, whether considering all of the evidence, both objective and subjective, the claimant's pain is in fact disabling.[248]  In this case, it is undisputed that Roberts' back condition is a pain-producing impairment, and that there is a nexus between his impairment and his subjective allegations of pain.  The ALJ was therefore required to consider all of the evidence to determine whether Roberts' pain was in fact disabling.

As the Tenth Circuit has observed, the evaluation of a claimant's subjective allegations of pain and other symptoms "ultimately and necessarily turns on credibility."[249]  Generally, credibility determinations are the province of the ALJ and should not be disturbed if supported by substantial evidence.[250]  Nevertheless, the ALJ's findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[251]  In *Kepler v. Chater*, the Tenth Circuit held that the ALJ must give specific reasons for rejecting a claimant's subjective allegations of pain.[252]  However, so long as the ALJ sets forth the specific evidence he relies on in assessing credibility, the requirements of *Kepler* are satisfied.[253]

The Tenth Circuit has listed several factors to be considered in evaluating allegations of pain:  (1) extensiveness of attempts to find relief from pain; (2) willingness to try prescribed treatment; (3) regular contact with a doctor; (4) the claimant's daily activities; (5) the dosage,

---

[248]*Hamlin*, 365 F.3d at 1220.

[249]*White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[250]*McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *White*, 287 F.3d at 909.

[251]*McGoffin*, 288 F.3d at 1254 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)); *Wall*, 561 F.3d at 1070.

[252]68 F.3d 387, 391 (10th Cir. 1995).

[253]*White*, 287 F.3d at 909.

effectiveness, and side effects of medication; (6) and the consistency or compatibility between the objective medical evidence and the nonmedical testimony.[254]

In this case, the ALJ stated that he had carefully evaluated all of the medical evidence to determine the extent and degree of Roberts' impairments, as well as his drug-seeking behavior, inconsistencies between his stated limitations and actual observations, misrepresentations to treating and examining physicians, and non-compliance with prescribed treatment, all of which negatively affected his credibility.[255]  The ALJ noted that the medical records show a pattern of noncompliance with treatment recommendations.  For example, Roberts had not taken his medications as prescribed, and had failed to follow through with recommendations that he "participate in physical therapy, vocational rehabilitation and a pain treatment program."[256]  The ALJ also discussed Roberts' drug-seeking activities, noting that he had requested numerous early refills, had alleged that he had lost his pills, had left them in relatives' vehicles, had gone on trips and left his medications in other states, needed more medications because he was going on trips, and had flushed his pills down the toilet.  In addition, he had been in jail for prescription fraud and marijuana possession.  The ALJ also noted that in June 2001, Dr. Weber believed that Roberts was selling his OxyContin.  And in May 2005, Dr. Day received an anonymous phone call reporting that Roberts was selling his OxyContin, which Roberts denied.  The ALJ further noted that Roberts had received prescriptions from multiple physicians and pharmacies.  The ALJ stated that Roberts' numerous trips to the emergency room appeared to be "more of an

---

[254]*Luna*, 834 F.2d at 165-66; *Huston*, 838 F.2d at 1132.

[255]Tr. 29.

[256]Tr. 29-30.

attempt to get narcotic medication rather than an attempt to receive treatment for any underlying disabling medical condition."[257]  The ALJ also noted that both Dr. Weber and Dr. Bingham had terminated treatment in November 2001 because of Roberts' drug-seeking behavior.  During 2005, Drs. Cole and Day indicated that Roberts was complying with his narcotic medication contract.  But in October 2005, Dr. Cole reported that Roberts had somehow received 390 pills when he should have received only 180.  Moreover, Roberts had not told his treating physicians about all of his emergency room visits and the medications he received there.[258]

The ALJ stated that although Roberts experiences some pain or discomfort from his degenerative disc disease, he found Roberts' allegations not credible to the extent that he claimed he is unable to perform any type of work.[259]  While the ALJ acknowledged that a claimant's subjective symptoms and descriptions of his impairments are important in making a disability determination, he stated that they must be consistent with and supported by the objective medical evidence.  In this case, the ALJ concluded that Roberts' complaints "far exceed any substantial objective evidence of a physiological source for the degree of pain alleged."[260]  The ALJ noted that Roberts' physical examinations had been well within normal limits; there was no evidence in the record of any significant neurological deficits; and strength and gait had been normal.  The ALJ observed that following Roberts' February 2002 surgery, his treatment "has been conservative at best, consisting of only narcotic pain medication."  Medical

---

[257]Tr. 30.

[258]Tr. 30.

[259]Tr. 30.

[260]Tr. 31.

records indicated that Roberts' pain was controlled with medication, and he did not experience significant side effects from the medication.  In addition, the ALJ noted that Drs. Tatton, Wilson, and Day had all indicated that Roberts could do some jobs.[261]

The ALJ also found Roberts' allegations of disabling pain inconsistent with his activities. The ALJ noted that Roberts had been "able to change tires on vehicles using a jack, pull barb wire, rake leaves, move boxes, travel to Oregon and California and work at jobs (carnival, church farm, fencing and railroad jobs, etc.) despite his alleged disabling pain."[262]  Finally, the ALJ concluded that although Roberts' degenerative disc disease would preclude him from strenuous activity, he was capable of sedentary work with the limitations set forth in the ALJ's RFC assessment such as the jobs suggested by the VE[263].

In challenging the ALJ's credibility determination, Roberts asserts that an ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain.[264]  Further, Roberts acknowledges that he is dependent upon narcotic pain medications.  He argues, however, that rather than destroying his credibility, his heavy, continual use of narcotic pain relievers actually proves his complaints regarding the severity of his pain.  He notes that physicians do not prescribe such medications unless they are convinced that the objective medical evidence supports the patient's complaints of severe pain.  Roberts states that although his physicians may have questioned the timing or amount of his medication requests, they almost

---

[261]Tr. 30.

[262]Tr. 31.

[263]Tr. 30, 31.

[264]Opening Brief at 32 (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

always gave him the "benefit of the doubt" and refilled his prescriptions. Roberts further points

out that the Tenth Circuit has recognized that drug-seeking behavior is consistent with chronic

pain.[265]

Although Roberts is correct that an ALJ may not rely on minimal daily activities as

substantial evidence that a claimant is not disabled, daily activities are one of the factors that an

ALJ should consider in assessing credibility. Likewise, while drug-seeking activity may show

that a claimant experiences pain, the evidence that Roberts was not forthright with his physicians

concerning his drug use is overwhelming. In this case, the ALJ gave specific reasons for his

credibility determination. The ALJ's credibility determination is entitled to great deference, and

will not be disturbed where, as here, it is supported by substantial evidence.[266]

## F.  ALJ's RFC Assessment

Roberts argues that the ALJ erred in failing to include his need to lie down for one hour

at a time and six hours in an eight-hour day.[267] As discussed above, the ALJ rejected Dr. Cole's

opinion regarding Roberts' need to lie down, and gave specific, legitimate reasons for doing so.

Thus, he was not required to include such a limitation in his RFC assessment.

Roberts also asserts that the ALJ was "required to make an individualized determination,

considering age, education, and work experience, including any skills the individual may have

that are transferable to other work, or education that provides for direct entry into skilled work,

---

[265]Opening Brief at 33 (citing *Bakalarski v. Apfel*, No. 97-1107, 1997 U.S. App. LEXIS 34055, *7-8 (10th Cir. Dec. 3, 1997) (unpublished).

[266]*Kepler*, 68 F.3d at 391.

[267]Opening Brief at 33-34.

under the rules and guidelines in the regulations."[268]  Roberts contends that the ALJ failed to make an individualized determination regarding Roberts' work experience in relation to the jobs identified by the VE, or to consider any particular skills he might retain in comparison to the particular requirements of those jobs.  Further, the ALJ made no specific inquiry to the VE regarding the particular requirements of each job in comparison to Roberts' particular functional limitations.  Finally, Roberts asserts that the ALJ did not comment on what effect his limited education would have on his ability to perform the jobs identified.  Roberts contends that these failures to make the individualized determination constitute reversible error.[269]

The ALJ included in the hypothetical to the VE all of Roberts' limitations that the ALJ found credible.[270]  The VE was therefore aware of Roberts' functional limitations, and also his educational level.  The VE then identified jobs existing in significant numbers in the national economy that the hypothetical individual could perform.  The ALJ's RFC assessment was proper and was supported by substantial evidence.

## G.  Significant Number of Jobs in the National Economy

In his last point, Roberts argues that the ALJ erred in accepting the VE's opinions regarding the number of existing jobs that could be performed with Roberts' limitations. Roberts asserts that because the VE only referred to the number of jobs existing in the national

---

[268]Opening Brief at 35 (citing SSR 96-9p).

[269]Opening Brief at 35-36.

[270]See *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996).

economy, and did not discuss the number of jobs available in Utah or the local region, the ALJ committed reversible error.[271]

The social security regulations provide that "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country."[272]  It does not matter whether jobs exist in the immediate area where the claimant lives, whether a specific job vacancy exists, or whether the claimant would he hired if he applied for work.[273]  Thus, "the number of jobs that contributes to the 'significant number of jobs' standard looks to the national economy–not just a local area."[274]  As the Tenth Circuit has explained, "Congress intended 'to provide a definition of disability which can be applied with uniformity and consistency throughout the Nation, without regard to where a particular individual may reside.'"[275]  Accordingly, the ALJ did not err by failing to question the VE concerning the number of jobs available in Utah or the local region.  Because the VE identified jobs existing in significant numbers in the national economy, there was no need to identify jobs in the regional economy.[276]  Thus, the VE's testimony provided substantial evidence to support

---

[271]Opening Brief at 36 (citing SSR 96-9p).

[272]20 C.F.R. §§ 404.1566(a), 416.966(a).

[273]20 C.F.R. §§ 404.1566(a), 416.966(a).

[274]*Gravitt v. Apfel*, No. 98-7156, 1999 WL 476026, at *2 (10th Cir. July 9, 1999)(unpublished)(quoting *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)).

[275]*Gravitt*, 1999 WL 476026, at *2 (quoting *Harmon*, 168 F.3d at 292).

[276]*Putman v. Astrue*, No. 4:07-cv-63, 2009 WL 838155, at *11-12 (E.D. Tenn. Mar. 30, 2009).

the ALJ's finding that Roberts was capable of performing work that existed in the national economy.[277]

## ORDER

The Commissioner applied the correct legal standards, and his decision is supported by substantial evidence.  Accordingly, the decision of the Commissioner is **AFFIRMED**.

September 28, 2009.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge

---

[277]*Decker*, 86 F.3d at 955; *Ellison*, 929 F.2d at 537.